Cooke, J.
The Brooklyn Elevated Railway Company was incorporated for the purpose of constructing and operating an elevated railroad from a point- near the Fulton Ferry, in the city of Brooklyn, easterly to a *171 place known as Woodhaven, on Long Island, a distance of about ten miles. The capital stock was to be five millions of dollars. On February 7, 1879, the company entered into a contract with Robert B. Floyd Jones, by which the latter agreed to build and equip the road, furnishing all the money necessary for that purpose, and to pay the interest on its bonds, and for which he was to be paid for each mile of completed road with a certain amount of rolling stock, $500,000 of the capital stock of the company, and $850,000 of bonds of the company, of a series of $3,500,000 of bonds to be secured by a trust deed or mortgage. W. Fontaine Bruff was at this time president of the company, and signed the contract as such. A deed of trust or mortgage was made on September 1, 1879, to secure the bonds, thirty-five hundred in number, for $1,000 each, by the terms of which deed such bonds were to be countersigned and certified on the application of the railway cempany, but only upon completed road, at the rate of three hundred and fifty bonds for each completed mile. Or, in case of the issue and sale of bonds before the section of road, in payment for which they were issued was completed, the proceeds should remain with the trust company until the work was done. This provision was necessary to secure the purchasers of the bonds something valuable, upon which the mortgage would attach, and to which resort could be had in case of non-payment. The bonds or their proceeds were to be paid to the contractors only upon production of the certificate of the engineer of the completion of the section of the road, for the payment of which said bonds were required. The day following the date of the contract with Floyd Jones, he (Jones) assigned the same to Mr. Bruff, the president of the company. On December 8, 1879, we find a certificate made by W. Fontaine Bruff, as engineer in chief, and John L. Nostrand, resident engineer, *172 addressed to the directors of the railway company, to the effect that the contractor, Mr. Floyd Jones, was entitled under his contract to $433,000 of full paid first mortgage bonds; and, upon like certificates made at different times, one thousand and seventy-eight of said bonds, amounting to $1,078,000, were countersigned, certified and issued by the trust company.
That, beside this scrip, obligations to deliver bonds to the amount of $225,000 have been issued by the company. That the whole capital stock of $5,000,000 has been issued and nearly all disposed of ; that about six millions par value of the resources of the company have thus been exhausted, and only $637,686.54 have been expended upon the road, not a mile of which has been completed, and consequently not a bond was due under the contract, or was issuable, except by preserving its proceeds in the Trust Company, without a violation of the covenants in the mortgage, and the condition of the bonds themselves, and a flagrant breach of faith with the bondholders, and not a share of stock was due to the contractor. The affidavits adduced on the part of the plaintiff tend in some degree to mitigate the extent of these misappropriations, and it is claimed that the stock and bonds yet remaining will possibly prove sufficient to complete the road; but upon the most favorable showing, the spoliation of the company is sufficient to shock the moral sense and call upon the court for a searching investigation, and its most potent effort for restitution. For Bruff to hold the several positions of contractor, to claim payment for the work done, engineer to certify to its completion, and that the amount claimed was due, and president of the company to issue the bonds, was to break down all the usual and necessary safeguards for the protection of the holders of stock and bonds, and other creditors of the corporation, and to permit it was a criminal dereliction of duty on the part of those to' *173 whom the interests of the company had been intrusted. Bruff says the contract was assigned to him merely as trustee. Trustee for whom? We have his answer. For the person from whom the money was to be raised for going on with the work—the money which the contractor was bound to furnish by the term of his contract. It means simply that he holds the contract in order that he may borrow money, or purchase materials and secure payment by hypothecating the bonds and stock which the contractor should become entitled to, as the work should, from section to section, be completed. But the effect is the same. He becomes, the contractor, and his attitude toward the corporation and the Trust Company has enabled him, to misappropriate and waste the resources of the corporation and bring.it to the verge of ruin.
This action is brought to obtain an accounting by Mr. Bruff and his two brothers for the property and effects which have been committed to their charge as directors of the company, and it is brought by a director, and asks that the defendant directors may be enjoined from further acting. The action was authorized by statute, and apparently a proper one to be brought, and no one disputes that the facts established on these motions will justify the claim that the defendant, W. Fontaine Bruff, should account for the effects misappropriated by him, and that he be enjoined from exercising his office, and that, if his two brothers are proved to have assented to, or connived at his irregularities, they are liable to the same extent; and so of every other person who, as director, is identified with them, or responsible for such illegal acts. The motion to remove the receivers is based upon the charge that Mr. Phelps was a director acting in concert with Bmff, assisting in the various transactions by which the company was defrauded, and liable equally with him to account for its property and effects,, and equally un *174 worthy to be intrusted with the corporate affairs. The evidence to charge Phelps consists mainly of the following : During the whole period from January, 1879, until two days previous to the commencement of the suit, he was a director of the company. This office imposed upon him the duty of vigilant attention to the business of the corporation. He was required to know what was being done in the board of which he was a member. It would be an impeachment of his business capacity and fidelity (so highly commended in the affidavits presented by him), to suppose he would hold . this office for over a year and a half, and during the entire struggle between the corporation and its plunderers, without knowing anything of its affairs. He says, in his affidavit, that he felt much interest in the road, and from the time of his election he has labored assiduously for its completion. He maintained friendly business relations with Bruff, and earnestly co-operated with him so long as there was any apparent possibility of success—which, it would seem, was until the last of July, when he tendered his resignation and refused any longer to serve as director. For several months past, he has been complaining, through his counsel, of improper management, but to Bruff he has said nothing by way of remonstrance. With all this interest and activity on the part of Phelps, he ought to, and must be presumed to, have seen that something was being done in the management which required his protest not only, but his determined resistance and denunciation. The proof furnished by himself is opposed to the claim that, through his inattention, the various schemes by which Bruff was enabled to possess himself of, and misappropriate- the recources of the company, were consummated in the board of directors without his knowledge. He is shown to have been present at a meeting of the board on one occasion in December 1879, when the matter of the assignment of *175 the Jones contract to Bruff was a subject of consideration, and Mr. Phelps does not deny knowledge of the fact that Bruff was acting as engineer as well as contractor and president of the company, and while he deposes that he never knew until after the stoppage of the work in May last, the nature, extent or cause of the financial difficulties in which the company was involved, he. does not deny knowledge Of the specific facts that no portion of the road had been completed, and yet that the stock and bonds of the road had been issued and put afloat in breach of the covenants in the mortgage and the conditions of the bonds, and that but a small fraction of their proceeds had been applied to the construction of the road. Beal estate was purchased and payments made therefor in stock of the company, the deeds to a portion of which were taken in the name of one Labiaux, a confidential clerk of Bobert B. Floyd Jones. What amount of the bonds and stocks has been disposed of in this way does not appear, but there is one transaction detailed in the deposition of Horace B. Fry and Allan Lee Smidt which too plainly indicates the manner, in which the millions of funds raised on the obligations of the company for the ostensible purpose of constructing its railway, were applied. This man Labiaux, who is said to have had no means of his own, had purchased a large property in California, upon which he was to pay §75,000 by way of earnest money on his contract to Messrs. Leon Abbett and Allen L. Smidt, trustees to receive the same. That on February 28, 1880, W. Fontaine Bruff received from Schafer his check on the Bank of New-York, for §80,000, proceeds of first mortgage bonds of the' Brooklyn Elevated Bailroad Company sold by him. Bruff deposited the check to his own individual credit, in the National Mechanics’ Banking Association, on the same day. That on March 5, Bruff drew his check for the same amount, *176 and delivered it to Robert B. Floyd Jones, who deposited it in the Phoenix National Bank to his credit, and immediately drew his check on said bank for $75,000, had it certified, and paid it over to Abbett and Smidt, as the earnest money on the Labiaux contract. Phelps claimed to the trustees one-third interest in this contract, and that Keeler, the plaintiff in this action, who was his bookkeeper, had one-thirty, and that other friends of his-(Phelps) were also interested in it, and Bruff in his affidavit swore that he had an interest in this contract. Although some portion of the facts relating to this transaction are stated upon information and belief, the statements are so circumstantial, giving dates, names and places and other details, as to eall for a denial, yet no denial is made by any of the parties, although other allegations contained in the affidavit of Mr. Fry in which this transaction is detailed, are specifically answered by Messrs. Bruff and Phelps.
The fact that Pheljis claimed a third interest in the contract is positively stated by Mr. Smidt and remains undenied.
He does not even deny that he had knowledge of where the money came from. The amount that would devolve on Mr. Phelps to raise, on account of his one-third interest, for making this very considerable payment, would be $25,000, and it would require a great stretch of credulity to believe either that he never knew of the payment, or knowing it, that he did not interest himself to ascertain how the money had been or was to be raised.
Upon the facts above stated, which are almost entirely conceded, and the inevitable inferences to be drawn from them, could the court, in a proper action brought for that purpose, withhold the judgment against Phelps if director, as well as Bruff, to suspend him from office. If not, he is a proper person to exercise the larger powers of a receiver, to whom are to be *177 intrusted the care of all the interests of the company, including the raising of funds and their application to the building and equipage of the road.
The fact that this action has been instigated by him and for his benefit, is of itself of no importance upon the question of his eligibility to the receivership, but the point is made that the action is brought and Phelps appointed receiver, in collusion with Bruff with a purpose of subserving Ms interests and continuing the railway and its affairs under the same management, and this is a question pertinent to the motions.
Phelps denies that Keeler was chosen a director by procurement of Bruff, but says that he insisted upon his election to protect his own interests ; that he was, and still is, in his service as bookkeeper; and the fact is not denied that he holds his office by virtue of one share of stock given to Mm to render him eligible.
Keeler says he never attended a meeting of the directors for the reason that he could not get any information of the manner in which the affairs had been conducted, so as to act intelligently.
How did he expect to obtain that information except by attending the meetings, or by inquiry of Bruff, or some other person having knowledge of the facts ? Bruff says he has not seen Keeler to speak to him in six months—which reaches back to a day anterior to Keeler’s election.
It must be confessed that if the object of Mr. Phelps was to secure in the board a champion of his rights in Mr. Keeler, his effort was a failure, and the readiness with which he yielded to Mr. Bruff’s request, a week or two after that election, to procure Mr. Keeler’s agreement to resign on request of Bruff, and place it, with his own similar agreement, in his hands, and the fact that he himself soon after ceased to act as director, would seem to prove that his determination to protect himself against Bruff had somewhat relaxed.
*178 It is evident from the affidavit of Mr. Bruff that this action was brought when it was in consequence of the interview he had with Messrs. Shafer and Jordan on October 6, which was followed on the same day by a meeting of the board of directors, at which the secretary says Mr. Phelps was present, and, with four others, resigned, and when Bruff stated that prosecution was threatened.
This suit was commenced two days afterward and the resignation of the five directors, which Wilson says was at the request of Bruff under his agreements, similar to those of Keeler and Phelps, and which reduced the number of directors below a quorum, was made a ground of this action and given in the complaint as a reason why a receiver should be appointed.
Although it is by no means clear to my mind that the proceeding was by collusion with Bruff for the purpose alleged, the circumstances attending it, taken in connection with the facts before referred to, respecting the transactions of the president and directors, could not fail to excite a suspicion in the minds of the patrons of the road and the public, that the former regime was to be resumed, and the efforts of the receivers to raise money and to complete their work, however honestly intended, would be greatly embarrassed.
I am satisfied that that degree of public confidence in the management necessary to the success of the enterprise would be wanting.
There is no doubt as to the legality of the appointment of the receivers in this action, or the propriety of the several orders made for their protection against the appointment in the third district in the suit subsequently brought by the attorney-general.
But I cannot consent to the proposition of the counsel for Phelps that this action, having been first *179 commenced, becomes exclusive and precludes any action by the attorney general.
Section 1,781 of the Code provides that an action' may be maintained against one or more trustees, directors, &c., of a corporation, to procure a judgment:
1. Compelling them to account.
2. Compelling them to pay to the corporation or its creditors any money, &c., which they have acquired to themselves, transferred, lost or wasted by a violation of their duties.
3. Suspending defendants from exercising their office when they have abused their trust.
4. Removing them from office for misconduct, ordering a new election, &c.
5. Setting aside an alienation of property by them, &o.
6. Restraining an alienation of property.
Section 1,782, authorizing an action to be brought for all or any of these objects by the attorney general, in behalf of the State, or by any creditor, director, &c. for any of the purposes except those specified in subdivisions 3 and 4.
This action is only for the purpose specified in subdivision 1. That brought by the attorney general for the purposes specified in subdivisions 1 and 3.
Again, this action calls for an accounting against three persons as directors. The other against five, including the plaintiff in this action, and Phelps, the receiver.
It cannot be either that this action, which is simply for an accounting, prevents an action by the attorney-general to suspend or remove the directors and order a new election, nor can this action, which calls for an accounting by three only of the directors, prevent an action against five. If so, Bruff himseM might have brought the action against his associates, and thus *180 secured to himself absolute impunity ; and so of any other director whose acts required scrutiny.
I am satisfied that the investigation to be had in ■this matter, in order to subserve the ends of justice, should extend to transactions in which Mr. Phelps was connected and matters affecting his interests. Can such an investigation, with a thoroughness such as is required, be reasonably expected in an action entirely under the control of Phelps himself %
When the investigation shall approach a matter unfavorably affecting the plaintiff, who is prosecuting, it would be pushed with the vigor demanded. A man cannot be expected or required to prosecute himself. Again, it will become the duty of the reciver to search for and restore to the corporation any property and effects which shall have been appropriated contrary to law, or for a purpose foreign to the lawful business objects of the corporation.
Care should be taken not to devolve this duty upon any man whose interest would be opposed to a full and faithful discharge of it.
For these reasons it is manifest that the action brought by the attorney general was necessary, and is the proceeding which must be relied upon to restore to the corporation the property which has been illegally taken from it.
The court must so regard it. This action, which cannot secure the full measure of justice, should not be allowed to furnish an obstacle to that in the name of the people, which can. The several orders, therefore, appointing receivers in this action and prescribing their duties, must be vacated, and it is referred to Theodore B. Gates, Esq., of Brooklyn, to take and pass the account of Messrs. Phelps and Wagstaff, and the plaintiff’s motions are denied.